**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SHARON GOVAN and** | ) | |
| **HILDRED GOVAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 21-cv-384-SMY** |
| **vs.** | ) | |
| | ) | |
| **EISAI, INC., and** | ) | |
| **ARENA PHARMACEUTICALS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

**YANDLE, District Judge:**

Plaintiffs Sharon Govan ("Govan") and Hildred Govan[1] (collectively, "the Plaintiffs") filed the instant action against Defendants Eisai, Inc. and Arena Pharmaceuticals, Inc., who distributed and manufactured the pharmaceutical weight-loss drug, Belviq. Govan used the drug between 2014 and 2020 and claims it caused her to develop breast cancer. Plaintiffs assert claims for negligence, defective design, failure to warn, breach of express and implied warranties, fraudulent misrepresentation and concealment, negligence misrepresentation, and loss of consortium. The case is now before the Court for consideration of partial motions to dismiss filed by Eisai (Doc. 17) and Arena (Doc. 19), which Plaintiffs oppose (Docs. 23 and 24). For the following reasons, the motions are **DENIED**.

---

[1] Hildred Govan, Sharon's spouse, asserts a claim of loss of consortium due to Sharon's alleged injuries. The Court refers only to Sharon when using the shorthand "Govan" herein.

**Background**

The following facts are taken from Plaintiffs' Complaint and are deemed true for the purposes of this motion.  *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008): Defendants developed, designed, manufactured, tested, advertised, distributed, and otherwise engaged in activities related to the sale and distribution of the drug Belviq, also known as lorcaserin hydrochloride.  Belviq is a first-in-class oral selective serotonin 5HT2c receptor agonist drug approved by the Federal Food & Drug Administration ("FDA") in 2012 as an adjunct to diet and exercise for chronic weight management in certain adults (Doc. 1, at ¶¶ 40, 55).

Defendants conducted numerous trial programs for Belviq.  A preclinical trial carcinogenic study on rats and mice identified lorcaserin as a non-genotoxic carcinogen that induced multiple tumor types and carcinomas.  *Id*. at ¶¶ 56, 60.  The studies put Defendants on notice or should have put Defendants on notice that lorcaserin was a carcinogen and that further testing needed to be done – testing that would have confirmed lorcaserin as a carcinogen.  *Id.* at ¶¶ 56-61.

Defendants also conducted two human studies between 2006 and 2009 which examined Belviq's efficacy in reducing body weight.  Defendants conducted a Behavioral modification and Lorcaserin for Overweight and Obesity Management ("BLOOM") trial from September 2006 through February 2009.  *Id.* at ¶ 62.  The BLOOM trial examined the efficacy of lorcaserin in reducing body weight.  *Id.*  While reduction was seen in the first year, all treatment groups experienced weight regain during the second year.  *Id.*  Defendants also conducted a Behavioral medication and Lorcaserin Second Study for Obesity Management ("BLOSSOM") trial from December 2007 to July 2009 to examine the effects of lorcaserin on body weight, cardiovascular risk, and safety in the United States.  *Id.* at ¶ 63.  The combined data from the BLOOM and BLOSSOM trials revealed only a 3.3% mean weight loss after one year with lorcaserin over that

of the placebo group, demonstrating that lorcaserin failed to meet the mean efficacy criterion of FDA's obesity draft guidance. *Id.* at ¶ 64.

On September 16, 2010, the FDA's Endocrinologic and Metabolic Drugs Advisory Committee ("EMDAC") met to discuss approval of Belviq based on the results of preclinical trials and the BLOOM and BLOSSOM Phase 3 clinical trials. The EMDAC panel voted against approval of Belviq as the potential benefits did not outweigh the potential risks based on concerns about the preclinical carcinogenicity findings (i.e., increased mammary adenocarcinoma/fibroadenoma and brain astrocytoma in rats) and marginal weight loss demonstrated by the clinical trials. *Id.* at ¶ 66.

On October 28, 2010, the FDA issued a Complete Response Letter (CRL) rejecting approval of Belviq. The bases for the CRL included uncertainty in diagnosis of mammary masses in rats, unresolved issues with the exposure-response relationship between lorcaserin and mammary adenocarcinoma, failure to identify a mode of action and a clear safety margin for brain astrocytoma, and marginal weight loss results. *Id.* at ¶ 67. In response to the CRL, Defendants convened a pathology working group (the "PWG") to blindly re-adjudicate the preclinical mammary tumor data in rats. *Id.* at ¶ 68.

On December 27, 2011, in response to the CRL, Defendants submitted to the FDA the final report of the BLOOM-DM study and data from the PWG re-adjudication, as well as new studies Defendants claimed supported their continued assertion that the increase in tumors seen in the two-year carcinogenicity rat study was due to elevated prolactin levels induced by lorcaserin – a rodent-specific phenomenon. *Id*. at ¶ 71. The PWG found a decreased number of adenocarcinoma and an increased number of fibroadenoma in both the control and the lorcaserin groups, which they claim was a rodent-specific phenomenon. *Id*. at ¶ 72. The PWG re-adjudication procedure and its

results were mis-adjudicated, misapplied, misinterpreted and/or otherwise skewed in favor of Defendants and, particularly, a finding that lorcaserin was not a carcinogen. *Id*. at ¶ 73. The results of the PWG re-adjudication, reviewed separately and/or in combination with the other studies, put Defendants on notice or should have put Defendants on notice that lorcaserin was a carcinogen and/or that further testing needed to be done, testing that would have confirmed lorcaserin as a carcinogen. *Id.* at ¶ 74.

In May 2012, a second EMDAC panel met to discuss approval of Belviq. The panel voted that the benefits of Belviq outweighed the risks for an overweight and obese population. *Id*. at ¶ 74. Following FDA approval, Arena as manufacturer and Eisai as the exclusive distributor, jointly launched Belviq in the United States. As required by the FDA, from January 2014 to June 2018, Defendants conducted a post-marketing trial of lorcaserin – the Cardiovascular and Metabolic Effects of Lorcaserin in Overweight and Obese Patients – Thrombolysis in Myocardial Infarction 61 (CAMELLIA-TIMI 61).

In January 2020, the FDA issued a safety communication regarding a possible increased risk of cancer associated with Belviq based on its review and analysis of the CAMELLIA-TIMI 61 data. *Id.* ¶¶ 80–81. The FDA identified imbalances in pancreatic, colorectal and lung cancers. The FDA announcement stated, among other things, that the risks of Belviq outweighed its benefits, and instructed all health care professionals to stop prescribing the drug and to contact their patients taking Belviq to inform them of the increased risk of cancer. *Id*. On February 13, 2020, the FDA announced that Eisai had submitted a request to voluntarily withdraw Belviq from the market given that data resulting from its Phase IV clinical trials indicated an imbalance of cancer in patients taking the drug. *Id*.

## Discussion

Eisai and Arena move to dismiss Plaintiffs' claims for design defect, breach of express and implied warranties, fraudulent misrepresentation and concealment, and negligence misrepresentation.[2] To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Lodholtz v. York Risk Servs. Group, Inc.,* 778 F.3d 635, 639 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The Court draws all reasonable inferences and facts in favor of the nonmovant. *See Vesely v. Armslist LLC,* 762 F.3d 661, 664 (7th Cir. 2014). Additionally, under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8(a)(2), a complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted).

Also relevant here, pursuant to Rule 9(b), a party pleading fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011); *United States v. Molina Healthcare of Illinois,*

---

[2] Arena filed a separate motion to dismiss, adopting by reference Easai's arguments by reference and adding the additional argument that Plaintiffs' express warranty claim against it fails to state a claim because Arena never distributed or sold Belviq in the United States.

*Inc.*, No. 20-2243, 2021 WL 5298012, at *5 (7th Cir. Nov. 15, 2021) (Rule 9(b) requires specificity, but it does not insist that a plaintiff literally prove her case in the complaint).

### Design Defect (Counts 1 and 2)

Under Illinois strict liability and negligence laws, design defect claims are similar. The key distinction is that strict liability claims focus on the product itself while negligence claims are addressed to a defendant's fault. *Calles v. Scripto–Tokai Corp.,* 864 N.E.2d 249, 263 (Ill. 2007). To state a negligence claim in a product liability action, a plaintiff must sufficiently allege the existence of a duty, a breach of that duty, an injury that was proximately caused by that breach, and damages. *See*, *Jablonski v. Ford Motor Co.,* 955 N.E.2d 1138, 1153–54 (Ill. 2011). To state a strict product liability claim, a plaintiff must sufficiently plead that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control. *See*, *Mikolajczyk v. Ford Motor Co.,* 901 N.E.2d 329, 335 (2008).

Defendants argue that Plaintiffs' have failed to state plausible negligence (Count 1) and strict liability (Count 2) claims based on a design defect theory. Specifically, Defendants contend that the Complaint only contains conclusory allegations and does not identify any alleged defect in Belviq's design that could have caused Plaintiff's breast cancer or allege how any such design defect allegedly caused her breast cancer.

Plaintiffs' Complaint goes beyond assertions of bare legal conclusions. Specifically, Plaintiffs allege:

- Defendants were responsible for the creation, design, manufacturing and testing of Belviq;

- Defendants knew or should have known, based upon their own scientific studies and medical literature as well as their communications with regulatory bodies, that

Belviq as designed posed a substantial likelihood of harm, particularly cancer, to humans;

- Defendants had not conducted sufficient and/or adequate testing regarding Belviq's carcinogenicity both before and after placing the drug on the market;

- The design defect of the drug was that use increased the risk of cancer, including the cancer suffered by Govan;

- Defendants created a product unreasonably dangerous in design for its normal and intended use;

- Belviq was not effective as a weight loss adjunct as demonstrated by its own clinical studies; and

- Govan used the product for 6 years which resulted in her developing cancer.

In the context of design-defect claims, plaintiffs are not required to plead exhaustive detailed factual allegations to survive a motion to dismiss. *See Bausch v. Stryker Corp.,* 630 F.3d 546, 560 (7th Cir. 2010) (negligence and strict liability claims for defective products need not specify a precise defect, and discovery may be needed to pinpoint the specific defect at issue). Here, the Complaint sets forth adequate facts from which a reasonable inference of liability may be made. As such the claims asserted are at the very least is plausible and the allegations give Defendants fair notice of the nature of the claims against them. Accordingly, Defendants' motions are denied as to Counts 1 and 2.

### Breach of Express Warranty (Count 3)

Generally, a party must have privity of contract in order to pursue a claim for breach of express warranty. *Canadian Pac. Ry. Co. v. Williams–Hayward Protective Coatings,* 2005 WL 782698, at *15 (N.D. Ill. Apr. 6, 2005) (applying Illinois law). An exception applies if a manufacturer "expressly warranted its goods to the ultimate consumers and this was the basis for the bargain and relied upon by plaintiffs." *In re McDonald's French Fries Litig.,* 503 F.Supp.2d

953, 957 (N.D. Ill. 2007).  Thus, to state a viable claim for breach of express warranty, a plaintiff must plead that the seller made an affirmation of fact that was part of the basis of the bargain between the parties.  *Oggi Trattoria & Caffe, Ltd. v. Isuzu Motors Am., Inc.,* 865 N.E.2d 334, 340 (Ill. 2007)). And "[i]n the context of a buyer purchasing a product from a dealer and not the manufacturer, Illinois courts have concluded that brochures, documents, and advertisements may be the basis of express warranty." *Canadian Pac. Ry. Co.,* 2005 WL 782698, at *15.  Invoking the exception to the privity requirement, Plaintiffs allege: that Defendants marketed, distributed and sold Belviq to the public as a weight-loss adjunct and warranted and represented to Govan and her prescribing physician, Dr. Owens, that Belviq was safe and effective to be used for that purpose; that Defendants warranted that Belviq's efficacy outweighed any safety risks associated with the drug and that the affirmations regarding the efficacy and safety of the drug were communicated via the Belviq label and Defendants' sales representatives; that had Dr. Owen not relied on the express warranties, but instead been properly equipped with knowledge of the risks associated with Belviq, he would not have prescribed the drug to Govan; and that   Govan would not have used Belviq had Defendants not made the representations.

While Defendants contend that Plaintiffs have not alleged privity and the Complaint is devoid of facts suggesting that an express warranty existed, at this stage of the litigation, Plaintiffs are not required to specifically identify what promotional materials Govan or Dr. Owens relied on. It is enough for Plaintiffs to describe the materials and allege that she and her doctor relied on this information. *See Rosenstern v. Allergan, Inc.*, 987 F. Supp. 2d 795, 805 (N.D. Ill. 2013).  As such,

Plaintiffs' allegations are sufficient to assert a plausible claim for express warranty.  Defendants' motion is denied as to Count 3[3].

## Breach of Implied Warranties (Count 4)

To state a claim for breach of the implied warranty of merchantability, a plaintiff must plead, among other things, that the goods sold were not merchantable at the time of sale (i.e. unfit for the ordinary purposes for which such goods are used).  *See* 810 ILCS 5/2–314(2)(c); *Griffin v. Medtronic, Inc.,* 2017 WL 4417821, at \*5 (N.D. Ill. Oct. 5, 2017).  Here, Plaintiffs allege that Belviq was not of merchantable quality and was unreasonably dangerous because it increased the risk of cancer and was not effective as a weight loss drug.  These allegations are sufficient under Rule 8 to put Defendants on notice of the claim.  Accordingly, Defendants' motion is denied as to Count 4.

## Fraudulent Misrepresentation and Concealment (Count 5)

State law fraud claims raised in federal court are subject to the heightened pleading requirements of Rule 9(b).  *United States v. Molina Healthcare of Illinois, Inc.,* 2021 WL 5298012, at \*3 (7th Cir. Nov. 15, 2021).  To state a claim for fraudulent misrepresentation a plaintiff must allege: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance upon the truth of the statement; and (5) damage to the plaintiff resulting from such reliance."

---

[3] Separately, Arena also argues that Plaintiffs' claim against it for breach of express warranty should be dismissed because it never distributed nor sold Belviq in the United States.  Arena cites no legal authority supporting its contention that a manufacturer must distribute or sell a product in the United States to be held liable for breach of express warranty.  Further, the allegations in the Complaint, which at this stage must be accepted as true, allege that Arena was granted permission by the FDA to market and sell Belviq in the United States and that Arena was responsible for the creation, design, manufacture, research, testing, advertisement, promotion, marketing, sale, and/or distribution, of Belviq.  Accordingly, Arena's additional argument is rejected.

*Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017).

To plead a fraudulent concealment claim, a plaintiff must sufficiently allege that the defendant "intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). A duty to disclose arises if "plaintiff and defendant are in a fiduciary or confidential relationship or in a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Id.* (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (1996)). Relatedly, to satisfy Rule 9(b) a plaintiff must plead the "who, what, when, where, and how" of their fraudulent misrepresentation and concealment claims.

As an initial matter, Plaintiffs' Complaint satisfies the Rule 9 pleading requirements – it alleges who was responsible for providing the misrepresentations (the Defendants); what information was withheld (the increased risk of cancer and misrepresentations about the drug's efficacy as a weight loss adjunct); the "when, where, and how" the misrepresentations occurred (Govan and her treating physician were misled through Belviq's labeling and Defendants' sales representatives between 2014 and 2020). Defendants' arguments to the contrary attempt to inject a greater degree of specificity at the pleading stage than the federal rules require.

Defendants also argue that Plaintiffs' fraudulent concealment claim should be dismissed because Plaintiffs fail to sufficiently plead a duty to disclose. Plaintiffs allege that (1) Govan used, and Dr. Owens, prescribed Belviq based on Defendants' concealments; (2) that they have no way to determine the truth behind Defendants' concealments; (3) that Defendants had sole access to material facts regarding the ineffective and defective nature of Belviq; and (4) thus, their reliance

upon Defendants' concealments was reasonable.  Again, these allegations are sufficient at this stage to plead the existence of a duty to disclose.  Count 5 survives dismissal at this juncture.

### Negligent Misrepresentation (Count 6)

In order to state a claim for negligent misrepresentation under Illinois law, a party must allege: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information.  *First Midwest Bank, N.A. v. Stewart Title Guar. Co.,* 843 N.E.2d 327, 334–35 (2006). Here, Plaintiffs allege that Defendants had a duty to represent to Govan, as well as the public at large, the true and accurate safety and efficacy information associated with Belviq and that, based on their own internal studies and outside medical literature, Defendants knew or should have known that cancer had been causally associated with Belviq and that the drug was not efficacious for use as a weight loss drug.  Plaintiffs also allege that Defendants breached their duty by failing to exercise ordinary care regarding their representations relating to Belviq and by misrepresenting to Govan and her prescribing physician that Belviq was safe and effective for use as a weight loss drug. Finally, Plaintiffs allege that Govan's injuries were a direct and proximate result of the misrepresentations and that she and her physician reasonably and justifiably relief on Defendants' misrepresentations.  These allegations satisfy the notice-pleading requirements of Rule 8.

### Conclusion

For the forgoing reasons, Defendants' partial motions to dismiss (Docs. 17 and 19) are **DENIED**.

IT IS SO ORDERED.

DATED:  November 29, 2021

**STACI M. YANDLE**
**United States District Judge**